Michael R. CORNWELL, Plaintiff–
Appellee, Cross–Appellant,

v.

Eric G. DAHLBERG, Dennis R. Baker,
Sgt. Tony Wilson, Defendants–
Appellants, Cross–Appellees.

Nos. 91–3532, 91–3580.

United States Court of Appeals,
Sixth Circuit.

Argued March 30, 1992.

Decided May 12, 1992.

Thomas Kelley (argued), and Armbruster, Kelley, McKenna & Modugno (briefed), Akron, Ohio, for plaintiff-appellant cross-appellee.

Samuel N. Lillard (argued), Asst. Atty. Gen., Columbus, Ohio, for defendants-appellees cross-appellants.

Before: MILBURN and SUHRHEINRICH, Circuit Judges; and TIMBERS,* Senior Circuit Judge.

TIMBERS, Senior Circuit Judge.

Appellants Warden Eric G. Dahlberg and two correctional officers, Dennis R. Baker and Tony Wilson (collectively "Dahlberg"), appeal from that part of a judgment entered in the Northern District of Ohio, David D. Dowd, *District Judge*, pursuant to a jury verdict against them for Fourth Amendment and Eighth Amendment violations arising from the detention and subsequent strip search of a prisoner, Michael R. Cornwell, following a prison uprising. Cornwell commenced this action pursuant to 42 U.S.C. § 1983 (1988).

Dahlberg asserts that the district court erred as a matter of law in submitting to the jury claims alleging the use of excessive force raised under the Fourth Amendment. He contends that Cornwell's exclusive remedy for use of excessive force is the Eighth Amendment's cruel and unusual punishment provision. With respect to the Fourth Amendment claim arising from the strip search, Dahlberg asserts in his brief that the court improperly charged the jury by allowing consideration of "the availability of alternate locations" for the strip search. At oral argument, Dahlberg suggested that the charge was inadequate because, among other things, it failed to accord due deference to the correction officers' decision to order the strip search. Dahlberg also challenges the district court's subsequent award of attorney's fees to Cornwell, pursuant to 42 U.S.C. § 1988 (1988).

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

Cross-appellant Cornwell challenges that portion of the judgment entered pursuant to the jury verdict against him for Eighth Amendment violations arising from the same detention and subsequent strip search. He contends primarily that the court erroneously instructed the jury according to the wrong standard under the Eighth Amendment. He says that the proper standard to be applied to such claims is that of "deliberate indifference" of prison officials. He also challenges the district court's reduction in his requested attorney's fees.

For the reasons set forth below, we reverse the judgment against Dahlberg individually on the Fourth Amendment claim pertaining to Cornwell's detention, and against Dahlberg and the correction officers on the Fourth Amendment privacy claims pertaining to the strip search, but we remand for a new trial on the privacy claims. With respect to Cornwell's cross-appeal, we affirm the judgment in favor of Dahlberg on the Eighth Amendment claims. Since we reverse the Fourth Amendment judgments, we do not reach the issue of attorney's fees.

I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

In February 1987, Cornwell was incarcerated at the Ohio State Reformatory (OSR) at Mansfield, Ohio. OSR is a correctional facility housing 2,400 inmates. The inmates are housed in two six-story cell blocks. The East Block houses maximum security prisoners, including Cornwell. The West Block houses medium security prisoners. OSR employs approximately 55–60 prison guards. In February 1987, OSR Warden Dahlberg responded to increasing assaults and thefts among the inmates of the two cell blocks by cutting back on the outdoor recreation time for

East Block prisoners. This measure was intended to segregate the prisoners of the two cell blocks during the recreation period in order to minimize the number of disruptive incidents.

On February 22, 1987, between 11:00 a.m. and 12:23 p.m., Cornwell and 76 other inmates from the East Block assembled on the bleachers of the outdoor recreation area. They intended to protest the new prison policy by staging a sit-in on the bleachers. At 12:30 p.m., when duty officer Baker signalled the end of the East Block recreation period, Cornwell and his fellow inmates refused to return to their cell block, despite orders* to do so from Baker.

At approximately 1:00 p.m., Warden Dahlberg was contacted at his home and advised of the sit-in. Dahlberg arrived on the scene at approximately 1:30 p.m. He ordered that all non-participating inmates be "locked down" in their cells in order to prevent the 77 protesting inmates from reentering the cell blocks and mingling with the other inmates to create a riot. He halted all normal prison operations. In response to their growing excitement over the possibility of a confrontation outside, the non-participating inmates made increasingly loud noises. Several inmates set small fires with toilet paper in their cells. This added to the mounting tension in the prison. Soon after Dahlberg's arrival, the inmates involved in the sit-in issued a demand letter complaining about the new prison policy.

At some point between 1:30 p.m. and 2:00 p.m., Dahlberg contacted officials at the Ohio Department of Rehabilitation and Correction to inform them of the situation. At that time, it was decided that the sit-in was to be terminated by force if necessary. All protesting inmates were to be immediately transferred to Lima Correctional Facility, which was equipped for riot control. During this period, Baker made contact with the protesters twice, ordering them to return to their cells. At 2:00 p.m., when the protesters had linked arms in resistance, corrections officers approached the inmates to remove them physically from the bleach-

ers. Several inmates ran in an attempt to dodge the guards. A tower guard responded by firing two warning shots, causing many inmates to fall to the ground until guards apprehended them. Several inmates fled from the outdoor recreation area, reentering the East Block and causing what Warden Dahlberg called a "potential crisis" by mingling with the other inmates. Without event, the mingling inmates were recaptured.

Ultimately, all 77 inmates were rounded up and divided into two groups. One group was placed in a triangular fenced area in front of the West Block. The other group, which included Cornwell, was placed in a similar area in front of the East Block. All of the inmates in the east area were searched for contraband and were handcuffed. All of the inmates were forced to lie face-down with their eyes closed in a cold, muddy area. The temperature on that day was between 40 and 44 degrees. Cornwell was ordered to remove his shoes, which were not returned to him. Female correctional officers monitoring the area collected identification badges from each of the inmates. The inmates were taken to a gymnasium between 30 and 100 feet from the area, where they were checked by medical personnel for injuries. The inmates then were returned to the outdoor area where they again were forced to lie face-down in the mud.

At approximately 3:35 p.m., Wilson, a sergeant at the Marion Correctional Institute (MCI), arrived at OSR with seven correctional officers, a bus, a van and a "chase vehicle". These officers were ordered to transport the protesters to the Lima facility. Wilson positioned the vehicles to form a more private area for strip searches prior to transport. The heaters in the vehicles were turned on to warm them for the inmates. Wilson says he ordered all female correctional officers out of the area. He placed an old sweatshirt on the ground for each of the inmates to stand on during the strip search. Each inmate was required to remove all clothing during the search. The searches were conducted before the seven correctional officers, the other protesting inmates, and any OSR correctional officers

who happened to pass through the designated area. Some female officers from OSR did observe the strip searches. Once each inmate had been checked again for injuries, strip searched, and reclothed, each was placed on the bus. At 5:18 p.m., the bus took the inmates to the Lima facility.

More than two years later—on July 11, 1989—Cornwell filed his Second Amended Complaint in which he alleged, among other things, violations of his Fourth Amendment and Eighth Amendment rights as a result of (1) the detention on the cold, wet ground, and (2) the strip search in front of female correctional officers. The case was submitted to the jury on September 20, 1990 with a set of interrogatories requiring the jury specifically to determine each Fourth and Eighth Amendment issue arising from the detention and the strip search. On September 21, the jury returned its verdict by answering the interrogatories. On all Eighth Amendment claims regarding both the detention and the strip search, the jury returned verdicts in favor of Dahlberg and the two correctional officers, Baker and Wilson. On all Fourth Amendment claims alleging a violation of Cornwell's right to privacy specifically during the strip search, the jury returned verdicts for Cornwell. On the Fourth Amendment claim specifically against Dahlberg and arising solely from his order of detention, the jury found in favor of Cornwell; on the identical Fourth Amendment claim against correctional officer Baker, the jury found in favor of Baker. Cornwell's request for attorney's fees was reduced by the court to $17,169.60. After denial of a motion for judgment n.o.v., the instant appeals followed.

## II.

With this summary of the facts and prior proceedings in mind, we turn first to Dahlberg's contention that the district court erred as a matter of law in instructing the jury to consider whether the conditions of Cornwell's detention in the outdoor area violated his Fourth Amendment rights. In considering this question of law, our review is *de novo.* *Whitney v. Brown,* 882 F.2d 1068, 1071 (6th Cir.1989).

■ We interpret Cornwell's Fourth Amendment claims arising from his detention on the cold, muddy ground as claims of excessive force, despite Cornwell's assertion that, since he made no complaint that prison officials actually assaulted him, his claims could not be so construed. Contrary to Cornwell's contention, claims of excessive force do not necessarily require allegations of assault. *E.g., Martin v. Board of County Comm'rs,* 909 F.2d 402, 406 (10th Cir.1990) (pre-trial detainee raising claim of excessive force under Fourth Amendment established claim by showing exercise of police authority and threats of physical coercion). Indeed, at oral argument in the instant case, Cornwell's counsel conceded that compelling Cornwell to lie on the cold ground constituted the use of force. Furthermore, Cornwell has not alleged a violation of any Fourth Amendment *privacy* right as a result of his detention.

■ Since Cornwell's claim against Dahlberg arising specifically from the outdoor detention was a claim of improper use of excessive force, we hold that such a claim asserted by a *convicted* prisoner is to be raised exclusively under the Eighth Amendment's cruel and unusual punishment clause. In an often cited footnote in *Graham v. Conner,* 490 U.S. 386 (1989), the Supreme Court stated:

"Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *After conviction, the Eighth Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified.'* Any protection that 'substantive due

process' affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment."

*Id.* at 395 n. 10 (emphasis added) (quoting *Whitley v. Albers,* 475 U.S. 312, 327 (1979)) (other citations omitted). In this Circuit, we recently have followed this reasoning to deny the Fourth Amendment claim of a *convicted* prisoner who alleged the use of excessive force by a prison guard who "choked" him in efforts to quell a prison uprising. *Farmer v. Seiter,* 943 F.2d 51 (6th Cir.1991). *See also Kinney v. Indiana Youth Ctr,* 950 F.2d 462, 465 (7th Cir.1991) (collecting cases) (convicted prisoner shot while attempting to escape from prison barred from raising claim of excessive force against prison guards under Fourth Amendment).

Since Cornwell's excessive force claim arising from his detention in the outdoor area can only be properly considered under the Eighth Amendment, we hold that the district court erred in submitting this claim of excessive force to the jury under the Fourth Amendment.

### III.

■ We caution, however, that our holding above did not preclude Cornwell from claiming a violation of his right of *privacy* under the Fourth Amendment. Rather, we limit our interpretation of the Supreme Court's language in *Graham, supra,* and its progeny to those claims of *excessive force* raised by convicted prisoners. Despite Dahlberg's protests at oral argument, this Circuit has joined others in recognizing that a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners. *E.g., Bell v. Wolfish,* 441 U.S. 520, 558 (1979); *Kent v. Johnson,* 821 F.2d 1220, 1226–27 (6th Cir.1987) (collecting cases). Accordingly, in challenging the conditions of his outdoor strip search be-fore several female OSR correctional officers, Cornwell raised a valid privacy claim under the Fourth Amendment that was properly submitted to the jury.

Despite the fact that Cornwell's Fourth Amendment privacy claim was submitted properly to the jury, Dahlberg's assertion that the court improperly charged the jury on the Fourth Amendment privacy claim arising from the strip search has merit. On appellate review, we consider whether the jury instructions "when taken as a whole, fairly and adequately submit issues and explain[ ] applicable law to the jury." *United States v. Baranek,* 959 F.2d 236 (6th Cir.1992); *United States v. Buckley,* 934 F.2d 84, 87 (6th Cir.1991).

In its charge, the court instructed the jury to determine whether, under the Fourth Amendment, defendants acted in an "objectively reasonable manner" during the detention *and* the strip search. In doing so, the court encouraged the jury to consider, among other factors, the "availability of alternate locations" for the strip search. The "objectively reasonable manner" charge is prescribed by the Supreme Court in *Graham, supra,* 490 U.S. at 395. *Graham,* however, considered the appropriate standard for review of a pre-trial detainee's Fourth Amendment claim of the use of *excessive force,* and not invasion of privacy. Since Cornwell is a convicted prisoner, we have held that he may not assert such a Fourth Amendment excessive force claim. In short, Cornwell's only outstanding Fourth Amendment claim to which the court's charge can apply is for the alleged violation of his limited right to *privacy* during the strip search.

In evaluating prison regulations that allegedly infringe on inmates' constitutional rights, the Supreme Court has set forth a completely different test: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is *reasonably related to legitimate penological interests." Turner v. Safely,* 482 U.S. 78, 89 (1987) (emphasis added) (reviewing prison regulations regarding inmate to inmate correspondance and marriage);

*O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) (challenge to regulations under Free Exercise clause applies same standard).

The "rational relationship" standard affords prison officials great flexibility to establish policies that would best balance the penological interests of the institution with the constitutional rights of the inmates. *Turner, supra,* 482 U.S. at 89. In determining whether the prison policy is reasonably related to some legitimate penological interest, courts have enumerated several factors for consideration, including (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation. *E.g., Michenfelder v. Sumner,* 860 F.2d 328, 331 (9th Cir.1988); *see also, Bell v. Wolfish, supra,* 441 U.S. at 559 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.").

This has been applied to unwritten prison policies as well as prison regulations that may violate an inmate's Fourth Amendment rights protecting against the invasion of privacy. In *Michenfelder, supra,* 860 F.2d at 331, the court applied the *Turner* standard in reviewing a prison policy regarding strip searches before the transport of inmates. In this Circuit, we applied *Turner*'s "reasonably related" standard upon reconsideration of an inmate's claim of Fourth Amendment privacy violations as a result of surveillance by female prison guards. *Kent v. Johnson,* 821 F.2d 1220, 1229 (6th Cir.1987) (Jones, J. on reconsideration).

In charging the jury regarding Cornwell's Fourth Amendment privacy claim stemming from the strip search, the court failed adequately to instruct the jury to find some valid, rational connection between the prison policy and a legitimate penological interest, as *Turner* requires. Furthermore, the court failed to inform the jury of the necessity of deference to prison officials in establishing these policies. As a result, we hold that the charge as a whole did not adequately inform the jury of the applicable law regarding invasion of privacy under the Fourth Amendment.

We reverse the judgment in favor of Cornwell on the Fourth Amendment claim of invasion of privacy stemming specifically from the strip search. Accordingly, we remand the case to the district court for a new trial on Cornwell's Fourth Amendment privacy claim arising from the strip search.

## IV.

On cross-appeal, Cornwell asserts that the court erred in its instruction pertaining to his Eighth Amendment claims. In its charge, the court stated that a cruel and unusual punishment claim raised under the Eighth Amendment in the context of a prison security measure "turns on whether the force was applied in good faith to restore [or] maintain discipline, or [was] applied maliciously for the purpose of causing harm." This charge was in accord with the Supreme Court's holding in *Whitley v. Albers,* 475 U.S. 312 (1986), which applied the "malicious" standard to the Eighth Amendment claim of an inmate shot by a guard during a prison uprising. Citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976), and its progeny, Cornwell now asserts that in certain circumstances, such as the refusal by prison officials to provide adequate medical care, an Eighth Amendment inquiry turns on whether prison officials acted with "deliberate indifference". Cornwell claims that his unconstitutional detention and strip search came *after* all protesting inmates had been subdued, signalling the end to a prison uprising, and thereby distinguishing this case from *Whitley.*

We need not reach the issue of whether the prison uprising had ended. Rather, the Supreme Court recently has held that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 112 S.Ct. 995, 999 (1992). We have applied the "malicious" standard in this Circuit to conflicts outside of the prison riot situation, and we see no reason to deviate from that standard in this case. *E.g., Haynes v. Marshall,* 887 F.2d 700, 703 (6th Cir.1989) (malicious standard applied to Eighth Amendment review of inmate's fatal injuries incurred during transfer from infirmary to cell).

### V.

Finally, Cornwell and Dahlberg each challenge the award of attorney's fees pursuant to 42 U.S.C. § 1988 (1988). Since we have reversed the judgments against Dahlberg individually on the Fourth Amendment claim arising from Cornwell's detention, and against Dahlberg and the other correction officers on the Fourth Amendment claims arising from the strip search, the issue of appropriate attorney's fees is not now ripe.

### VI.

To summarize:

The district court erred in submitting to the jury Cornwell's Fourth Amendment claim stemming specifically from his detention. Accordingly, we reverse the judgment entered against Dahlberg individually.

The district court further erred in its instruction on Cornwell's Fourth Amendment invasion of privacy claims stemming from the strip search. The charge as a whole failed to instruct the jury to determine whether the prison policy of strip searching was reasonably related to a legitimate penological objective. Accordingly,

we reverse the judgment against Dahlberg and the officers on these counts and remand the case to the district court for a new trial.

Finally, the court did not err in its instructions regarding Cornwell's Eighth Amendment claims of cruel and unusual punishment. We therefore affirm the judgment favoring Dahlberg on all Eighth Amendment claims.

*Affirmed in part, reversed in part and remanded for a new trial.*