RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LARRY BRANNUM and NECOLE BRANNUM, as next friend and guardian for Chelsey Brannum, et al.,

       *Plaintiffs-Appellees,*

    *v.*

OVERTON COUNTY SCHOOL BOARD; EDUTECH, INC.; DOLPHUS DIAL; LENARD LEDBETTER; MICHELLE THRASHER; JOHN DOES, 1-10; JOHN DOES, 11-20,

       *Defendants,*

WILLIAM NEEDHAM; ROBERT JOLLEY; MELINDA BEATTY; DAVID LANGFORD; JOEY SMITH; EDITH KEY; DONALD BROWN; MELODY WILLIAMS; TIM COFFEE,

       *Defendants-Appellants.*

No. 06-5931

---

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 03-00065—William J. Haynes, Jr., District Judge.

Argued: April 20, 2007

Decided and Filed: February 20, 2008

Before: RYAN and GRIFFIN, Circuit Judges; HOOD, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Michael B. Schwegler, MILLS & COOPER, Brentwood, Tennessee, for Appellants. Mark P. Chalos, LIEFF, CABRASER, HEIMANN & BERNSTEIN, Nashville, Tennessee, for Appellees. **ON BRIEF:** Michael B. Schwegler, Michael P. Mills, MILLS & COOPER, Brentwood, Tennessee, for Appellants. Mark P. Chalos, LIEFF, CABRASER, HEIMANN & BERNSTEIN, Nashville, Tennessee, Jack D. Lowery, Jr., LOWERY, LOWERY & CHERRY, Lebanon, Tennessee, for Appellees.

---

[*] The Honorable Joseph M. Hood, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

---

**OPINION**

---

RYAN, Circuit Judge.  Thirty-four Tennessee middle school students sued various officials of the Overton County, Tennessee, public school system under 42 U.S.C. § 1983 and others, alleging that the defendant school authorities violated the students' constitutional right to privacy by installing and operating video surveillance equipment in the boys' and girls' locker rooms in Livingston Middle School (LMS), and by viewing and retaining the recorded images.

The defendant Overton County school board members, the director of schools, the LMS principal, and the assistant principal, moved for summary judgment claiming qualified immunity. The district court denied their motions and they now appeal.

We conclude that the district court correctly denied summary judgment to the school officials, who are not entitled to claim the defense of qualified immunity, and incorrectly denied summary judgment to the defendant board members and the Director of Schools, who are immune.

**I.**

In an effort to improve security at LMS, the Overton County School Board approved the installation of video surveillance equipment throughout the school building.  The school board engaged the education technology firm, Edutech, Inc., to install cameras and monitoring equipment. The board ordered the Director of Schools, William Needham, to oversee the project.  Needham delegated his authority for the installation of the monitoring equipment to the LMS Principal, Melinda Beaty, who delegated her authority to the Assistant Principal, Robert Jolley.  None of the defendants promulgated any guidelines, written or otherwise, determining the number, location, or operation of the surveillance cameras.

After several meetings, Assistant Principal Jolley and an Edutech representative decided to install the cameras throughout the school in areas facing the exterior doors, in hallways leading to exterior doors, and in the boys' and girls' locker rooms.  The cameras were installed and were operational by July 2002.

The images captured by the cameras were transmitted to a computer terminal in Jolley's office where they were displayed and were stored on the computer's hard drive.  Jolley testified that, in September 2002, he discovered that the locker room cameras were videotaping areas in which students routinely dressed for athletic activities.  He said that he immediately notified Principal Beaty of the situation and suggested that the placement of the cameras be changed.  But, the cameras were not removed nor were their locations changed for the remainder of the fall semester.

In addition to Jolley receiving the images on his computer, they were also accessible via remote internet connection.  Any person with access to the software username, password, and Internet Protocol (IP) address could access the stored images.  Neither Jolley nor anyone else had ever changed the system password or username from its default setting.  The record indicates that the system was accessed ninety-eight different times between July 12, 2002, and January 10, 2003, including through internet service providers located in Rock Hill, South Carolina; Clarksville, Tennessee; and Gainsboro, Tennessee.

During a girls' basketball game at LMS on January 9, 2003, visiting team members from Allons Elementary School noticed the camera in the girls' locker room and brought this to the attention of their coach, Kathy Carr.  Carr questioned Principal Beaty, who assured Carr that the camera was not activated.  In fact, the camera was activated and had recorded images of the Allons

team members in their undergarments when they changed their clothes. After the game, Carr reported the camera incident to the Allons school principal, who contacted Defendant Needham later that evening. Needham immediately accessed the security system from his home and viewed the recorded images. The following morning, January 10, Needham, Beaty, and two other officials viewed the images in Needham's office by remote access. Needham later stated that in his opinion, the videotapes of the 10 to 14 year old girls contained "nothing more than images of a few bras and panties." School employees removed the locker room cameras later that day.

From July 2002 to January 2003, when the cameras were operational, a number of children from Overton County Schools and schools from the surrounding counties used the LMS locker rooms for athletic events and were videotape recorded while changing their clothes.

## II.

The plaintiffs insist at the outset that this court lacks jurisdiction to hear the defendants' appeal because denial of summary judgment on the ground of qualified immunity does not constitute a "final decision" under 28 U.S.C. § 1291. It is true that as a general rule, a denial of summary judgment is not an appealable final judgment. *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004), but there are exceptions, and this case presents one of them.

The law is well-settled that an order denying a defendant public official a right to assert a defense of qualified immunity is the procedural equivalent of an appealable final judgment. *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985); *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (*en banc*). Qualified immunity is not a mere defense to liability; it is a rule of law that the defendant public official is immune to suit and any obligation to defend it. *Mitchell*, 472 U.S. at 526. If a public official is unable to appeal the denial of qualified immunity immediately, he would be forced to endure the cost, expense, and inconvenience of defending an action to which he may be immune. To require him to delay his appeal challenging the trial court's rejection of his qualified immunity defense until the underlying liability issue is determined, would defeat one of the very purposes for which the doctrine exists. Thus, we have jurisdiction to consider an interlocutory appeal from the denial of qualified immunity, but only to the extent the appeal turns on an issue of law. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005). For purposes of this appeal, the appellants have conceded the plaintiffs' version of the facts and raise only the issue of the students' right to privacy from videotaping under the Fourth Amendment.

For these reasons, we are satisfied that the order rejecting the defendants' claim of qualified immunity is a final judgment and that we have jurisdiction to entertain the defendants' appeal. We proceed, now, to the substantive issue.

## III.

Congress enacted 42 U.S.C. § 1983 to permit an injured person to recover in federal court against defendants who violate a plaintiff's federal statutory or constitutional rights while acting under color of state law. *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002). There is no dispute in this case that the defendant school officials were acting under color of state law when they authorized the installation and operation of the security cameras at LMS. However, public officials are entitled to be dismissed from a lawsuit on qualified immunity grounds if they can show that they did not violate any of the plaintiff's federal statutory or constitutional rights that were "clearly established" at the time of the alleged misconduct and of which the defendants could reasonably be expected to have been aware. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

On appeal of a district court's order denying summary judgment on qualified immunity grounds, we consider all the relevant facts in the light most favorable to the plaintiffs and review *de novo* the district court's determination on the legal question of the availability of qualified immunity.

*Solomon*, 389 F.3d at 172. The approach we take in determining whether the defendants are entitled to claim the legal defense of qualified immunity is to decide whether a constitutional right of the students was violated and whether the constitutional right violated was clearly established and one of which the defendants can reasonably be expected to have been aware. *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 603 (6th Cir. 2005).

**A.**

The students argue that their constitutionally protected right to privacy encompasses the right not to be videotaped while dressing and undressing in school athletic locker rooms—a place specifically designated by the school authorities for such intimate, personal activity. The plaintiffs also argue that the basis of their privacy right resides in the Due Process Clause of the Fourteenth Amendment as well as in the Fourth Amendment as made applicable to the states through incorporation into the Fourteenth Amendment. We conclude that the privacy right involved here is one protected by the Fourth Amendment's guarantee against unreasonable searches, and that in this case, the defendants violated the students' rights under the amendment.

Before explaining our Fourth Amendment analysis, we think it might be useful to explain why we do not assess the students' privacy claims under the Due Process Clause of the Fourteenth Amendment. This court has held that the constitutional right to privacy, which includes the right to shield one's body from exposure to viewing by the opposite sex, derives from the Fourth Amendment, rather than the Due Process Clause. *See Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987). We are aware that some circuits have found that the same privacy right is located in the Due Process Clause. *See Everson v. Michigan Dept. of Corrections*, 391 F.3d 737, 757 n.26 (6th Cir. 2004) (citing other circuits). However, since the Fourth Amendment approach is the precedent in this circuit, and the Supreme Court seems to prefer it, *infra*, we will follow our precedent.

**B.**

The Fourth Amendment to the United States Constitution provides that the federal government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. The Supreme Court has held that the Fourth Amendment applies in the public school context to protect students from unconstitutional searches conducted by school officials. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985).

Neither the Supreme Court nor this court has ever addressed the applicability of video surveillance to the Fourth Amendment's proscription against unreasonable searches. However, the Supreme Court has applied the amendment's guarantees to practices that were not in existence at the time the amendment was enacted and has instructed that in such cases, the ultimate measure of the constitutionality of such searches is one of "reasonableness." *Vernonia*, 515 U.S. at 652. Some other courts that have considered the constitutional implications of video surveillance have held that such practices are subject to the strictures of the Fourth Amendment. *See United States v. Gonzalez*, 328 F.3d 543 (9th Cir. 2003); *United States v. Falls*, 34 F.3d 674 (8th Cir. 1994); and *United States v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990).

This court has considered the constitutional implications of surveillance policies in the context of prison security. In *Kent*, there was the question whether a policy allowing female prison guards to observe male inmates in the shower and in various states of undress violated the prisoner-appellant's privacy right under the Fourth Amendment. We noted that "[n]either the Supreme Court nor the Sixth Circuit has ever expressly recognized that the fourth amendment 'right to privacy'

encompasses the right to shield one's naked body from view by members of the opposite sex." *Kent*, 821 F.2d at 1226. We concluded, however:

> Perhaps it is merely an abundance of common experience that leads inexorably to the conclusion that there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex when not reasonably necessary for some legitimate, overriding reason, for the obverse would be repugnant to notions of human decency and personal integrity.

*Id.* Before *Kent*, we had not articulated the Fourth Amendment's protection as extending to the "right to shield one's naked body from view by members of the opposite sex." But, since *Kent*, we have recognized this privacy right. *See Beard*, 402 F.3d at 602; *Cornwell*, 963 F.2d at 916. We recognize, of course, that this is not a case of "naked bodies" being viewed by the surveillance cameras, but rather underwear clad teen and pre-teen boys and girls. However, the difference is one of degree, rather than of kind.

Our conclusion, mentioned earlier, that the method of surveillance involved in this case—video cameras—is governed by the Fourth Amendment, is informed by the Supreme Court's reasoning in *Vernonia* and *T.L.O.*, in which the Court addressed the constitutional prerequisites of valid school searches. The standards for testing the constitutionality of searches in the public school setting depend, to considerable extent, on the context. As the Court pointedly observed in *Vernonia*, the students' "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia*, 515 U.S. at 656. In *T.L.O.*, the Court offered a framework for analyzing this issue that we think is helpful in this case: First, we consider whether the state action—the installation of the cameras—"was justified at its inception"; and second, whether the search—here the videotaped surveillance—"as actually conducted 'was reasonably related in scope to the circumstances which justified the [surveillance/search] in the first place.'" *T.L.O.*, 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

A student search is justified in its *inception* when there are reasonable grounds for suspecting that the search will garner evidence that a student has violated or is violating the law or the rules of the school, or is in imminent danger of injury on school premises. *Id.* at 342. In this case, the policy of setting up video surveillance equipment throughout the school was instituted for the sake of increasing security, which is an appropriate and common sense purpose and not one subject to our judicial veto. However, the scope and manner in which the video surveillance was conducted is subject to Fourth Amendment limitations, and therefore, appropriate for our inquiry.

A search—and there can be no dispute that videotaping students in a school locker room is a search under the Fourth Amendment—is "permissible in its *scope* when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the *infraction*." *Id.* (emphasis added). It is a matter of balancing the scope and the manner in which the search is conducted in light of the students' reasonable expectations of privacy, the nature of the intrusion, and the severity of the school officials' need in enacting such policies, *Beard*, 402 F.3d at 604, including particularly, any history of injurious behavior that could reasonably suggest the need for the challenged intrusion.

To meet the requirements imposed by the Constitution, the method chosen by the defendants to improve school building security in this case need not have been the only method available or even the one this court might have chosen; it is necessary, however, that the method chosen was, in the circumstances, *justifiably* intrusive in light of the purpose of the policy being carried out.

The Fourth Amendment does not protect all expectations of privacy; only those that society recognizes as reasonable and legitimate. *T.L.O.*, 469 U.S. at 338. The Supreme Court has acknowledged that generally, students have a less robust expectation of privacy than is afforded the general population. *Id.* at 348 (Powell, J., concurring). Indeed, this expectation may be even less for student athletes in locker rooms, which the Court has previously observed are places "not notable for the privacy they afford." *Vernonia*, 515 U.S. at 657.

This does not mean, however, that a student's expectation of privacy in his or her school locker room is nonexistent. In fact, we have stated before that even in locker rooms, students retain "a significant privacy interest in their unclothed bodies." *Beard*, 402 F.3d at 604. Unlike the situation in *Vernonia*, where the students and their parents were well aware that participation in school sports was conditioned on the students submitting to the drug testing policies, neither the students nor their parents in this case were aware of the video surveillance in the locker rooms, to say nothing of the videotaping. Further, while the Court in *Vernonia* pointed out the lower level of privacy typically associated with school locker rooms, we are satisfied that students using the LMS locker rooms could reasonably expect that no one, especially the school administrators, would videotape them, without their knowledge, in various states of undress while they changed their clothes for an athletic activity.

## C.

Video surveillance is inherently intrusive. As one authority has put it, a video camera "sees all, and forgets nothing." *Constitutionality of Secret Video Surveillance*, 91 A.L.R.5th 585, § 2 (2001). In *Vernonia*, the Supreme Court addressed the intrusiveness of a procedure employed for obtaining urine samples from students in order to conduct drug screening. The male students produced urine samples at a urinal along a wall while a male monitor watched from a distance. The female students produced samples in individual enclosed stalls while a female monitor stood outside. Neither the males nor the females were forced to remove their clothing before the monitors or expose themselves to the monitors. *Vernonia*, 515 U.S. at 658. The Court determined that the procedural precautions directed at ensuring the privacy of the students were significant, which helped to ensure that the policy was minimally invasive in practice.

In *Beard*, we considered the constitutionality of a strip search conducted by the school officials when a student reported that she was missing some money. The male and female students were separated and taken to different places in the school. The female students, while in full view of the others and the school officials, were required to lift up their shirts and pull down their pants without removing their undergarments. The males, on the other hand, were forced to remove their outer clothing and pull down their undergarments for inspection by the school official. We found that the character and scope of this search was unreasonably intrusive upon the students' privacy. *Beard*, 402 F.3d at 605-06.

In this case, the scope of the search consisted of the video recording and image storage of the children while changing their clothes. In *Vernonia*, procedural safeguards were put into place to protect the students' privacy, but in this case, the school officials wholly failed to institute any policies designed to protect the privacy of the students and did not even advise the students or their parents that students were being videotaped. Likewise, as the female students in *Beard* were inspected while in their undergarments, the students here were also observed in their undergarments while they were in the school locker rooms. We believe that the scope of the secret surveillance in this case, like the strip search in *Beard*, significantly invaded the students' reasonable expectations of privacy.

**D.**

In determining whether a search is excessive in its scope, "the nature and immediacy of the governmental concern" that prompted the search is considered. *Vernonia*, 515 U.S. at 660. Of course, a valid purpose does not necessarily validate the means employed to achieve it. In order to satisfy the constitutional requirements, the means employed must be congruent to the end sought. *See T.L.O.*, 469 U.S. at 341-42.

In *Vernonia* and *T.L.O.*, the governmental concern was in preventing the trafficking and possession of illegal drugs on school property. In *T.L.O.*, the search was conducted because of a suspicion that the girls were in possession of contraband, and the scope of the search consisted of inspecting a student's purse. In *Vernonia*, the drug testing was prompted by the concern that student athletes were involved in drug use and the search was limited to students voluntarily participating in scholastic sports who were required to produce urine samples in circumstances designed to ensure the student athlete's privacy.

In this case, the defendants were prompted to install video surveillance cameras by a concern that school safety measures should be enhanced. It is indisputable that the operation of the video cameras intruded upon the students' privacy; the question is whether, given the purpose for which the cameras were operating, the intrusion was reasonable. One measure of reasonableness is the congruence or incongruence of the policy to be served (student safety), and the means adopted to serve it. Surveillance of school hallways and other areas in which students mingle in the normal course of student life is one thing; camera surveillance of students dressing and undressing in the locker room—a place specifically set aside to offer privacy—is quite another. The two do not stand on equal footing.

Stated differently, the surveillance methodology employed, in particular the installation and operation of the cameras in the locker rooms, in order to be reasonable in its scope, must be congruent to the need for such a search in order to serve the policy goal of school safety and security. There is nothing whatsoever in this record to indicate that the defendants entertained any concerns about student safety or security in the locker rooms that would reasonably justify the installation of the cameras to record all the activities there. The defendants do not claim that any misconduct occurred in these areas in the past or that the plan to install the surveillance equipment in the school locker rooms was adopted because of any reasonable suspicion of wrongful activity or injurious behavior in the future. Indeed, the record suggests that the school board members and Director Needham were not even aware that cameras were positioned to monitor activities in the locker rooms.

While at a hypothetical level there might exist a heightened concern for student safety in the "privacy" of student locker rooms, that does not render any and all means of detection and deterrence reasonable. As the commonly understood expectation for privacy increases, the range and nature of permissible government intrusion decreases.

Given the universal understanding among middle school age children in this country that a school locker room is a place of heightened privacy, we believe placing cameras in such a way so as to view the children dressing and undressing in a locker room is incongruent to any demonstrated necessity, and wholly disproportionate to the claimed policy goal of assuring increased school security, especially when there is no history of any threat to security in the locker rooms.

We are satisfied that both the students' expectation of privacy and the character of the intrusion are greater in this case than those at issue in *Vernonia* and *T.L.O.* We conclude that the locker room videotaping was a search, unreasonable in its scope, and violated the students' Fourth Amendment privacy rights.

**IV.**

Our conclusion that the students' constitutional rights were violated does not end the inquiry, however. Under the qualified immunity doctrine, public officials cannot be held liable for violating a person's constitutional rights unless the right was clearly established at the time of the alleged improper conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The underlying principle here is that a person's right to recover damages for a public official's misconduct violating the person's constitutional protection, does not stand on the same footing as a person's right to recover damages for injuries caused by a non-governmental tortfeasor. The policy of the law is that governmental administrative officials are sometimes "given a pass" for violating a citizen's constitutional rights because, if it were otherwise, government officials would be undesirably inhibited in exercising the broad discretion given them to carry out their duties wisely, effectively, and without fear of personal liability if they make a mistake that injures someone.

The "pass" does not extend, however, to violating a constitutional right that is "clearly established" and of which the violator is, or ought to have been, aware. In *Anderson v. Creighton*, 483 U.S. 635 (1987), the Supreme Court articulated the meaning of "clearly established" in the context of the defense of qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640.

In analyzing whether a constitutional right is clearly established, we look "*principally* to the decisions of the United States Supreme Court and this circuit to determine whether the law was clearly established at the time of the action." *Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993) (emphasis added). The Supreme Court has left it to the lower federal courts to decide, case by case, what "clearly established" means when applied to factual situations not previously confronted by the Supreme Court. The Court provided some guidance in *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004), when it announced that the specific constitutional right at issue must be clearly established when considered at an appropriate level of specificity and cannot be asserted at a high level of generality. To be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991).

Some personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion. Surreptitiously videotaping the plaintiffs in various states of undress is plainly among them. *See Poe v. Leonard*, 282 F.3d 123, 138-39 (2d Cir. 2002); *see also York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). Stated differently, and more specifically, a person of ordinary common sense, to say nothing of professional school administrators, would know without need for specific instruction from a federal court, that teenagers have an inherent personal dignity, a sense of decency and self-respect, and a sensitivity about their bodily privacy that are at the core of their personal liberty and that are grossly offended by their being surreptitiously videotaped while changing their clothes in a school locker room. These notions of personal privacy are "clearly established" in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches. But even if that were not self-evident, the cases we have discussed, *supra*, would lead a reasonable school administrator to conclude that the students' constitutionally protected privacy right not to be surreptitiously videotaped while changing their clothes is judicially clearly established.

We therefore conclude that the plaintiffs have adequately alleged a Fourth Amendment violation of their constitutional right to privacy because the students had a reasonable expectation of privacy and the invasion of the students' privacy in this case was not justified by the school's need to assure security. We further conclude that this constitutional violation is actionable because this particular right was clearly established at the time of the videotaping, such that a reasonable person who knew or ought to have known of the videotaping would be aware that what he or she was doing violated the Fourth Amendment. Therefore, the school officials directly involved in the decision to install the cameras and responsible for determining their locations, that is, defendants Beaty and Jolley, are not entitled to qualified immunity. Whether they are shown to have any personal liability to the plaintiffs is a question for determination by the fact finder, not this court.

There is no indication in the record that the defendant school board members or Director Needham authorized or were aware of the locker room videotaping. Their role was limited to a general decision to improve school building security by installing video equipment. The decision as to the location of the cameras and how and when they would be used was beyond their personal involvement and their role in the matters giving rise to this suit are too indirect to subject them to § 1983 liability. Therefore, the defendant board members and Director Needham are immune and were entitled to summary judgment, but the remaining defendants were not.

## V.

Accordingly, we **AFFIRM** the district court's judgment denying qualified immunity to the defendants Melinda Beaty and Robert Jolley. We **REVERSE** the denial of summary judgment as to the defendant school board members and William Needham because they are entitled to claim qualified immunity, and **REMAND** the case for further proceedings.