NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0265n.06

No. 23-5685

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| TIMOTHY MATTHEW TURNER, | ) | **FILED** |
| Plaintiff – Appellant, | ) | Jun 17, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| HELEN LONG, et al., | ) | KENTUCKY |
| Defendants - Appellees. | ) |  |
|  | ) | OPINION |

Before: BOGGS, KETHLEDGE, and MURPHY, Circuit Judges.

BOGGS, Circuit Judge. In this § 1983 prisoner civil-rights case, Appellant, Timothy Turner, raises three constitutional claims: 1) an Eighth Amendment unsanitary-conditions-of-confinement claim for being forced to wear ripped, stained, and rancid paper-boxer underwear for three straight weeks; 2) a Fourth Amendment claim for violation of bodily privacy for having to wear badly torn paper boxers, leaving him exposed; Fand 3) an Eighth Amendment deliberate-indifference claim arising from the actions of a prison official who allegedly told another inmate that Turner was a confidential informant, after which inmates assaulted Turner for being a "snitch." The district court granted summary judgment in favor of the defendants on all claims, which Turner now appeals. We deal with each claim in turn.

### I.       Factual Background

Turner, a 350-pound Kentucky coal miner, had been incarcerated without incident for over 9 years at the Luther Luckett Correctional Complex (LLCC) in LaGrange, Kentucky until June 2020. At that time, in response to the COVID-19 pandemic, LLCC was considering modification

to its visitation room to allow non-contact visitation. But a large number of inmate workers quit after being threatened with physical harm by other inmates if they built the visitation booths. Relying on "confidential informants," Internal Affairs Unit Captain Tim Forgy and defendant, Lieutenant Bert Bare, investigated the incident and filed disciplinary reports against Turner and several other inmates, including Michael Carper, both of whom were then confined to the Restrictive Housing Unit (RHU).

The RHU houses inmates who are removed from the prison's general population for a variety of reasons, including disciplinary violations, protective custody, suicide watch, and pending transfer to another facility. In 2018, in response to a series of suicide attempts, LLCC instituted a policy that all inmates assigned to the RHU, regardless of reason, be issued a security blanket and security smock instead of standard-issue clothing. That policy was understood by defendants to also mandate the issuance of paper-boxer underwear. Defendants Helen Long and Benjamin Harlan were Unit Administrators in the RHU, responsible for distributing paper boxers to RHU inmates, who would be offered "clean, new, size-appropriate paper boxers 3-4 times a week when they [took] showers, and upon request if needed."

Turner was confined to the RHU from June 8 through August 14, 2020. On June 26, due to supply-chain issues, the RHU ran out of paper boxers in Turner's XXXL size. By June 29, Turner had been wearing the same paper boxers for five consecutive days. Turner told Long and Harlan that his paper boxers were stained with urine and feces, "had a foul odor," and asked for new boxers. Long informed Turner that paper boxers in his size, XXXL, were backordered. Turner asked if he could wear cloth boxers from his personal property until the proper size-XXXL paper boxers became available. Long and Hunt refused his request and only offered to provide smaller

size-L paper boxers. Thereafter, each time Turner took a shower, Long offered him a new pair of clean size-L paper boxers. Turner refused to try to put them on, knowing that wearing too-small boxers was like "putting a square peg in a round hole" and that "it could not be done."

On June 29, Turner filed a written grievance asking that he be allowed to "wear regular clothes suitable for RHU so that I wont [sic] have to wear nasty and falling apart underwear." His grievance was denied. By July 15, Turner had still not received clean underwear, despite "begging and pleading daily for relief." Although Turner had a suicide smock that was meant to cover prisoners to the mid-thigh, Turner states that the Velcro that held it together was not strong enough to hold it closed over his 350-pound body, and that the smock did not always cover his buttocks and genitals, particularly at night when the smock would ride up as he moved in his bed "exposing his nakedness" in full view of his cellmate and a security camera for others to view.

After 22 days, Turner's soiled boxers were falling apart and were "destroyed" from "water, urine or feces." So, this time when he was offered size-L paper boxers, Turner tried to put them on, but he "could not pull them all the way up for fear of them busting apart." Turner "embarrassingly walked down the hall to his room" with several men heckling him and making sexually explicit comments. When he got to his cell and sat on his bed, the size-L paper boxers "came apart at the seam."

The next morning, July 16, Turner told Harlan that his boxers were "completely ripped out" and showed him his bare buttocks to illustrate the problem. According to Turner, all Harlan said was: "Nice." Turner then went to recreation, his one hour of fresh air in his otherwise 23-hour-cellbound day. While exercising, Turner became hot and sweaty and took off his Velcro-challenged security smock. Because his paper boxers were "completely ripped" his bare "buttocks

and genitals" were exposed to everyone in recreation and to security cameras. Other prisoners started heckling Turner with "l[ewd] and sexual[ly] motivated statements." Turner states that he asked defendant Bare, who was present and heard these comments, for help filing a Prison Rape Elimination Act (PREA) request. Bare informed him this was not a PREA situation and said: "Looks like your ass is out of luck." Turner said this resulted in other prisoners making additional "obscene statements and comments."

Captain Sarah Crawford came to the scene and Turner states that he showed Crawford his buttocks through his ripped boxers and pleaded to be given a pair of cloth boxers from his personal property. Approximately fifteen minutes later, Crawford brought Turner his requested personal cloth boxers, which Turner had been requesting to wear since June 26, almost 3 weeks earlier. In her affidavit, Crawford stated that Turner was laughing about the situation, that she only saw a small rip and saw no skin or "private parts." Crawford contacted the Deputy Warden for Security, Patricia Gunter, who authorized her to issue Turner a pair of his personal cloth boxers until the size-XXXL paper boxers were back in stock. Crawford also said that a second pair of personal boxers were provided to Turner for use while his other pair was being washed. Turner continued to wear his cloth boxers without incident until the size-XXXL paper boxers were restocked.

Turner alleges that a few weeks later, on August 3, 2020, Lt. Bare told inmate Carper, in front of other prisoners, that Turner was a "confidential informant" in the visitation-booth investigation and was the reason that Carper had been placed in the RHU. Turner stated that he was afraid, as other prisoners called him a "rat," a "jailhouse snitch" and had placed a "hit" on him. On August 14, Turner returned to the prison's general population, and on August 26, another prisoner assaulted him, hitting him in the head with a lock. Turner required medical attention and

was sent back to the RHU. Afraid of other attacks, Turner sought protective custody and a transfer to a different prison. He refused to go back to the prison's general population, and remained in the RHU through March 2021 when he was transferred to the Little Sandy Correctional Complex in Elliott County, Kentucky.

## II.     Procedural History and Standard of Review

Turner filed a pro se civil-rights complaint under 42 U.S.C. § 1983, raising three constitutional claims: an Eighth Amendment prison-conditions claim for failure to provide clean, hygienic underwear; a Fourth Amendment bodily-privacy claim arising from the paper boxers that exposed his buttocks and genitals to other prisoners, staff, and security cameras; and an Eighth Amendment claim against Lt. Bare for being deliberately indifferent to Turner's safety by telling other prisoners that Turner was a confidential informant. Defendants moved for summary judgment, which the district court granted on June 29, 2023. Turner timely filed this appeal and is now represented by counsel.

We review the district court's grant of summary judgment de novo, *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 836 (6th Cir. 2023), and view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate where materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

### III.     Discussion

### A.     Eighth Amendment Prison-Conditions Claim

In his Eighth Amendment conditions-of-confinement claim, Turner alleges that the defendants failed to provide him clean hygienic underwear for over three weeks, forcing him to wear the same urine- and feces-stained, moldy, and smelly paper boxers that ultimately fell apart leaving him with no underwear to wear on his XXXL-sized frame and forcing him to try to wear size-L paper boxers, which he could not pull up over his butt and which ripped, leaving his genitals and buttocks exposed. To establish an Eighth Amendment violation based on the conditions of confinement, an inmate must show that 1) he suffered a "sufficiently serious" deprivation and 2) a prison official acted with a "sufficiently culpable state of mind" in creating that condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). In prison-conditions cases, a sufficiently culpable state of mind is one of "deliberate indifference" to inmate health or safety. *Ibid*. The Eighth Amendment protects prisoners from being denied "the basic elements of hygiene." *Parrish v. Johnson*, 800 F.2d 600, 609 (6th Cir. 1986) (citation omitted). Poor sanitary conditions, particularly those related to human waste, can establish a constitutional violation. *See Taylor v. Larson*, 505 F. App'x 475, 477 (6th Cir. 2012).

The district court granted summary judgment to the defendants on the ground that Turner's claim was barred by the Prison Litigation Reform Act, which among other things prohibits a "prisoner" from seeking compensatory damages for "emotional injuries" alone. *See* 42 U.S.C. § 1997e(e); *Small v. Brock*, 963 F.3d 539, 543 (6th Cir. 2020) (collecting cases). The district court held that, because Turner alleged only that his conditions of confinement caused him "emotional

distress," the PLRA categorically barred this claim. The court did not address the merits of Turner's claim.

On appeal, Turner argues, and defendants concede, that the § 1997e(e) physical-injury requirement does not apply to demands for nominal and punitive damages. *Small*, 963 F.3d at 543-44. We agree. Although the PLRA bars prisoners from seeking compensatory damages for "emotional" injuries, it does not bar them from seeking nominal or punitive damages for those injuries. *See Small*, 963 F.3d at 543. Here, Turner indisputably sought punitive damages and perhaps nominal damages, if we construe his pro se complaint liberally. Thus, the PLRA does not bar his conditions-of-confinement claim, and the district court erred in concluding otherwise.

Defendants ask that we affirm on alternative grounds and decide the case on the merits or qualified immunity. "Absent exceptional circumstances," we "normally decline to rule on an issue not decided below." *Stoudemire v. Mich. Dept. of Corrs.*, 705 F.3d 560, 576 (6th Cir. 2013) (cleaned up). District courts are far more familiar with the factual record and remand ensures "any future appeal . . . will have the benefit of the district court's analysis." *Brown v. Crowley*, 312 F.3d 782, 788 (6th Cir. 2002). No circumstances here suggest that we should do anything other than reverse and remand this case to the district court.

**B.      Fourth Amendment Bodily-Privacy Claim**

Turner's Fourth Amendment bodily-privacy claim is based on his being forced to wear torn, disintegrating, and soiled paper boxers for 3 weeks and being offered only the size-L paper boxers that immediately tore apart at the seams, both of which resulted in his buttocks and genitals being exposed to male and female staff, prisoners in the recreation area, and security cameras. He

claims that wearing a mid-thigh length suicide smock did not help, as it did not stay closed over his XXXL-size body.

This court has long recognized that "a convicted prisoner maintains some reasonable expectations of privacy while in prison." *Stoudemire*, 705 F.3d at 572 (citing *Cornwell v. Dahlberg,* 963 F.2d 912, 916 (6th Cir. 1992)). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). This applies equally to prison regulations and unwritten prison policies. *Cornwell*, 963 F.2d at 917. Under *Turner*, "several factors" are relevant in determining the reasonableness of the regulation at issue, including 1) whether a "valid, rational connection" exists between the prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence of an alternative means for inmates to exercise their constitutional right; 3) the impact that accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources; and 4) the absence of ready alternatives as evidence of the reasonableness of a prison regulation. *Turner*, 482 U.S. at 89-90; *Cornwell*, 963 F.2d at 917.

This court has considered a prisoner's right to privacy most often in the context of strip-search cases. *See, e.g., Sumpter v. Wayne Cnty*., 868 F.3d 473, 481-82 (6th Cir. 2017) (strip-search); *Williams v. City of Cleveland*, 771 F.3d 945, 952-55 (6th Cir. 2014) (strip-search and seizure); *Stoudemire*, 705 F.3d at 572-74 (strip-search); *Mills v. City of Barbourville*, 389 F.3d 568, 571 (6th Cir. 2004) (female prisoner strip-searched in view of male prison guards); *Cornwell*, 963 F.2d at 916 (strip-search); *Kent v. Johnson*, 821 F.2d 1220, 1222 (6th Cir. 1987) (routine visual inspection of prisoners in the shower). In that context, we have held that:

> [T]here must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex when not reasonably necessary for some legitimate, overriding reason, for the obverse would be repugnant to notions of human decency and personal integrity.

*Kent*, 821 F.2d at 1226. However, the accidental viewing of a prisoner's naked body by a prison guard of the opposite sex is not a constitutional violation. *Mills*, 389 F.3d at 579.

Here the district court recognized Turner's fundamental right to be free from forced exposure to strangers of the opposite sex but held that "[a]ny exposure of Turner to female LLCC staff—or anyone else, for that matter—was accidental." Further, the court held that Turner had a mid-thigh length security smock, and therefore, "even if giving Turner boxers that were likely to rip constituted forcing him to expose himself, wearing the smock would have prevented that exposure. Because there is no evidence that anyone forced Turner to expose himself, Defendants are entitled to summary judgment."

The district court's conclusion ignores Turner's claim that he was exposed to two prison officials of the opposite sex, an RHU administrator and a security guard, and his claim that his exposure occurred because of a prison policy. Further, the court failed to apply the *Turner v. Safley* factors in determining whether the paper-boxer policy violated Turner's Fourth Amendment right to privacy. The district court should have considered: 1) whether LLCC had a legitimate governmental interest in forcing RHU inmates to wear paper boxers where the RHU written policy was based on concerns about suicide attempts, the RHU housed inmates for many reasons not related to suicide, and the unwritten paper-boxer policy had no stated justification, as the defendants wrongly believed it was part of the RHU written policy; 2) whether Turner could exercise his right to privacy in spite of the RHU paper-boxer policy; 3) the impact that letting

Turner wear his personal cloth underwear would have had on guards and other inmates; and 4) the absence of ready alternatives as evidence of the reasonableness of a prison regulation.

Here, Turner's personal XXXL-size cloth underwear were readily available, could have been provided at no cost to the prison, and ultimately were provided to Turner. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90 (internal quotation marks omitted). "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

In addition, defendants assert qualified immunity and challenge whether Turner's right to privacy was a clearly established constitutional right. Yet the district court did not consider that issue below, and the briefing before us is lightly developed. We therefore reverse and remand Turner's Fourth Amendment claim for the district court to consider these issues (including the defendants' qualified-immunity defense) in the first instance. *See Stoudemire*, 705 F.3d at 576.

## C. Eighth Amendment Deliberate Indifference

In his Eighth Amendment deliberate-indifference claim, Turner alleges that Lt. Bare knowingly placed him at a substantial risk of suffering serious harm when Bare told other prisoners that Turner was a confidential informant. The defendants moved for summary judgment, attaching an affidavit from Bare, who swore that he had said no such thing. *See* R.32-4, Pg. ID 355. Turner responded with an affidavit of his own, swearing that Bare did tell other inmates, in Turner's presence, that Turner was a confidential informant. While Turner's affidavit provided little context for his allegation, he referenced a prison grievance form that he had filed against Bare in August

2020 and had attached to his pro se complaint. In that grievance, Turner specified that Bare made this comment to another inmate, Michael Carper, on August 3, 2020, "on the walk" in "B-Lower" in the RHU.

The district court granted summary judgment, holding that Turner produced no "admissible evidence that the alleged conversation between Bare and Carper ever happened." In doing so, the district court did not mention the portion of Turner's affidavit in which he claimed to have heard Bare make these comments; nor did the court mention Turner's grievance form, which he referenced in his affidavit and attached to his complaint. Instead, the court focused on the lack of specificity in Turner's affidavit which did not state that Turner himself had heard Bare's comments. The district court therefore concluded that, "without a sworn statement from someone with personal knowledge" of Bare's comments, "Turner's claim cannot proceed."

The defendants "concede" that an "inmate who asserts that a correctional official told other inmates that they are a confidential informant states a constitutional claim under the Eighth Amendment." But defendants nonetheless argue that the district court properly granted summary judgment to Bare because Turner failed to create a genuine issue of fact, arguing that his affidavit provides no "context surrounding his claim that he was present when Bare made the alleged comments." Thus, the parties agree that the sole question on appeal is whether a reasonable jury could find that Turner heard Bare tell other inmates that Turner was a confidential informant.

Affidavits offered in opposition to summary judgment create an issue of fact only to the extent they are not conclusory and otherwise provide evidence that would be admissible if offered live on the witness stand. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). For that reason, Turner could not create a genuine issue by testifying about what other inmates told him about Bare's comments. *See Lemon v. Norfolk S. Ry. Co.*, 958 F.3d 417, 420

(6th Cir. 2020) (summary-judgment affidavits cannot rely on inadmissible hearsay). Instead, Turner was required to produce evidence from which a jury could find that Turner himself heard Bare tell other inmates that Turner was a "snitch." Bare's statement would then be admissible as a statement made by a party-opponent.

The parties presented conflicting evidence on that point. Turner submitted a sworn affidavit in which he said that Bare told other inmates—in Turner's presence—that Turner was a confidential informant. That affidavit also referenced other evidence in the summary-judgment record—a grievance form, filed in August 2020, in which Turner alleged that Bare had made this comment to a specific inmate (Michael Carper) on a specific date (August 3, 2020) in a specific area of the RHU ("on the walk" in "B-Lower"). The defendants pointed to the affidavit from Bare, who called Turner's allegations "patently false." On this record, we see no reason whatever that would prevent a reasonable factfinder from believing Turner's version of events—which means that his testimony created a genuine issue of material fact.

Defendants argue that Turner's affidavit is "insufficient to establish personal knowledge." But the "personal knowledge" requirement in Civil Rule 56(c), like the one in Evidence Rule 602, merely requires that an affiant's statements be grounded in observation or other first-hand experience. *See United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). On the record, a reasonable factfinder could plainly infer that, if Bare made these statements in Turner's "presence," then Turner himself heard them. *See Bazemore v. Papa John's, Inc.*, 74 F.4th 795, 798 (6th Cir. 2023). Defendants also argue that, given Turner's "near total confinement in his cell, it is unreasonable to infer that Turner was in the presence of Inmate Carper or any other inmate when Bare made his alleged comment." However, there is nothing inherently implausible about Turner's version of events as Bare allegedly made these comments

on August 3, 2020, a weekday during which Turner would have been allowed an hour outside of his cell. To reject Turner's version of events as "implausible," therefore, would require us to draw an unfavorable inference against the nonmoving party at summary judgment. This we will not do.

## IV. Conclusion

We **REVERSE and REMAND** to the district court Turner's Eighth Amendment prison-conditions claim; Turner's Fourth Amendment bodily-privacy claim; and Turner's Eighth Amendment claim for deliberate indifference.