NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0339n.06

Case No. 21-4025

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 18, 2022
DEBORAH S. HUNT, Clerk

KARL FUGATE,

    Plaintiff-Appellee,

v.

RONALD ERDOS, Warden,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

O P I N I O N

Before: SILER, McKEAGUE, and LARSEN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Plaintiff Karl Fugate, an Ohio inmate, filed this suit under 42 U.S.C. § 1983 against the warden of his prison, Defendant Ronald Erdos, alleging violations of the Fourth and Eighth Amendments to the Constitution after the warden imposed three strip searches per day for 30 days while Fugate was kept in a segregated cell. The district court denied the warden qualified immunity at summary judgment. The warden brings this interlocutory appeal. We dismiss in part for lack of appellate jurisdiction and affirm the denial of qualified immunity.

**I.**

**A. Facts**

At the time of the events here, Karl Fugate was an inmate at the Southern Ohio Correctional Facility located in Lucasville, Ohio. Lucasville is a maximum-security prison, one security level

below the Ohio State Penitentiary, Ohio's most secure institution. Ronald Erdos is the warden at Lucasville.

On January 17, 2017, Fugate was transported in full restraint to the Rules Infraction Board room for a disciplinary hearing. Fugate had just assaulted a fellow inmate in hopes that the Board would increase his security classification, resulting in a transfer from Lucasville to the State Penitentiary. Prior to the hearing, Fugate formulated a plan to attack one of the hearing officers, Anderson, whom Fugate claimed had a history of harassing him. Unbeknownst to the guards, Fugate had on him a concealed shank made from a sharpened battery casing. At the end of the hearing, the Board informed Fugate that he would not be transferred. Visibly upset, Fugate stood up and struck Anderson in the face with the sharpened battery casing. Anderson suffered a one-inch laceration to the cheek that required medical attention.

Immediately after the attack, two officers tackled Fugate and punched him in the face several times. According to the officers, Fugate continued to resist, so they continued striking him. Eventually, officers secured Fugate and took him out of the hearing room to a holding cell. After getting Fugate to the holding cell, three officers took Fugate to the infirmary. Fugate claims that the three officers took him to the infirmary because there are no cameras there. Once in the camera-less infirmary, Fugate claims that the officers took turns beating him until he became unconscious "three, four times[.]" R. 78-1 at PID 1159. The officers dispute this accusation, claiming that they merely secured him in the infirmary "until he could be seen by medical staff." The magistrate judge, in analysis that the district court later adopted, concluded that a jury could find that Fugate exhibited far more injuries after his stay in the infirmary than prior to his arrival,

supporting the inference that the officers beat him in the infirmary.[1]  Once a physician eventually

evaluated Fugate, the physician recommended that he be taken via ambulance to the hospital due

to his injuries.

Back from the hospital, Fugate was placed in Lucasville's segregated "J1 cell block."

Within the J1 block, Fugate was placed in a "slammer cell."  According to Warden Erdos, "J1 is

where inmates are housed who have committed the most violent offense[s] until such time it is

determined that he can be safely housed" in a different block.  R. 61-4 at ¶ 6.  Pursuant to a "post

order" issued by Warden Erdos, which is not in the record, all inmates in the J1 slammer cells

underwent a search of their cells and a strip search twice a day, once during each of the first two

shifts.

According to the warden, the strip searches are supposed to be performed in the following

manner:

> First they open the gate to the corridor outside the cells, and walk to the cell of the
> inmate intended to be searched.  The guard then orders the inmate to cuff-up, where
> the inmate turns his back to the cuff-port and allows himself to be cuffed.  After
> cuffing the inmate, the guard then leaves the corridor, through the gate, which is
> then shut, and the cell door is electronically opened.  The inmate is then ordered to
> the shower, where he was secured, and then strip searched.  The guard then walks
> to the opened cell where he conducts a search of the cell.  After the cell is searched,
> the guard leaves the corridor, and the inmate (handcuffed) is allowed to walk back
> to his cell from the shower, where the cell door is closed.  Then the guard walks to
> the front of the cell, and takes off the restraints from the cuff-port.

R. 61-4 at ¶ 8.  Because of Fugate's recent attacks of an inmate and a guard, the warden testified

that he ordered Fugate to undergo a third daily strip search during third shift.  The warden claims

that he ordered the third daily search because he was "particularly concerned about [Fugate]

---

[1] In interlocutory appeals from the denial of qualified immunity at summary judgment, "we often may be able merely to adopt the district court's recitation of facts and inferences."  *Adams v. Blount Cnty.*, 946 F.3d 940, 949 (6th Cir. 2020) (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)).

obtaining a weapon from a porter, at the end of second [shift], after the guards conduct their searches." *Id.* at ¶ 10.

Around 4:00 a.m. following Fugate's first night in the slammer cell, Fugate claims that Warden Erdos came to his cell and threatened, "if you do anything else to my staff, we're going to beat the fuck out of you again." R. 78-1 at PID 1191. That morning, a Captain sent an email to the rest of jail staff reading: "Per Warden Erdos Inmate Fugate is to be shookdown at the beginning of every shift!!!" R. 54-1 at PID 281. Fugate testified that, around 6:30 that morning, seven officers and a "white shirt" (a supervisor) barged into his cell and took him to the shower for his first strip search. R. 78-1 at PID 1191–92. Officers at Lucasville proceeded to strip search Fugate three times per day over the next 30 days. The searches occurred around 6:30 a.m., 2:00 p.m., and between midnight and 1:30 a.m. According to Fugate, later in the month, one of the guards told him "you think I want to fucking do this shit? . . . I asked the warden when I come into work every day when is this going to stop, you know, and he keeps telling me when he feels like it." R. 78-1 at PID 1197.

After 30 days, the strip searches abruptly ended, including the two daily searches required by the post order. No contraband was found during the 90 strip searches. Fugate was not strip searched again after the 30 days even though he remained in the J1 slammer cell for another "month or two." The magistrate judge noted Fugate's speculation that the strip searches ended around the time the Ohio Highway Patrol apparently began investigating the alleged beating Fugate suffered in the infirmary, but the record contains no information about the results of that investigation.

**B. Procedural Background**

In June 2017, Fugate obtained his transfer to the State Penitentiary. He then filed this pro se lawsuit in January 2019 under 42 U.S.C. § 1983 against Warden Erdos, challenging the constitutionality of the strip searches under the Fourth and Eighth Amendments. Fugate also sued the officers who allegedly beat him in the infirmary under the Eighth Amendment. The defendants moved for summary judgment, asserting the defense of qualified immunity. The magistrate judge recommended that the district court deny Warden Erdos's motion for summary judgment and also that the court deny summary judgment to two of the officers who allegedly beat Fugate in the infirmary. The district court subsequently adopted that analysis over the defendants' objections.

Warden Erdos now appeals the denial of qualified immunity. The two officers who allegedly beat Fugate in the infirmary do not appeal the district court's denial of qualified immunity. Thus, this appeal concerns only Warden Erdos and the strip searches.

**II.**

Before jumping to the merits of the warden's appeal, we must first ensure that we have jurisdiction. We have jurisdiction to review a district court's denial of qualified immunity on an interlocutory appeal. 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But our review is limited to "only purely legal questions." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006)). We "cannot decide disputed factual issues at the summary-judgment stage, and if the appeal from a denial of qualified immunity turns on an issue of fact, we may not exercise jurisdiction." *Barry*, 895 F.3d at 443 (citing *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)). We must defer to the district court's factual determinations, and "a defendant may not challenge the inferences that the district court draws from [the] facts, as that too is a prohibited fact-based appeal." *Gillispie v. Miami*

*Twp.*, 18 F.4th 909, 916 (6th Cir. 2021) (quoting *Barry*, 895 F.3d at 443); *but see Barry*, 895 F.3d at 445 (Sutton, J., dissenting).

Two exceptions apply to this jurisdictional rule. First, when, "despite disputing a plaintiff's version of the story," the defendant "is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Adams*, 946 F.3d at 948 (quoting *Barry*, 895 F.3d at 443). Second, "in exceptional circumstances, we may decide an appeal challenging the district court's factual determination if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Neither exception applies here.

Nonetheless, "[i]n determining the scope of our jurisdiction, we [may] 'separate an appellant's reviewable challenges from its unreviewable.'" *Adams*, 946 F.3d at 948 (quoting *Diluzio v. Vill. of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015)). We may therefore "still review 'pure question[s] of law, despite the defendants' failure to concede the plaintiff's version of the facts[.]" *Id.* (quoting *Livermore ex el. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007)). In doing so, we "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Id.* (quoting *Diluzio*, 796 F.3d at 611).

We take that path here. Although the warden mounts several factual challenges over which we lack jurisdiction, he also raises several legal arguments. Thus, we will excise the warden's improper factual arguments from this appeal while exercising jurisdiction over his legal arguments. *See, e.g.*, *Thompson*, 831 F.3d at 371 ("Nevertheless the officers raise three legal issues which we can decide on the basis of the plaintiff's version of the facts as recognized by the district court.").

One final jurisdictional matter. Warden Erdos also appeals the district court's denial of summary judgment based on 42 U.S.C. § 1997e(e). Appellant's Br. at 43. That provision says: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act . . . ." 42 U.S.C. § 1997e(e). Although the warden's arguments under § 1997e(e) are legal and not factual, § 1997e(e) is not relevant to qualified immunity. That statute imposes limitations on the types of claims prisoners may bring in federal court; it has no role to play in defining a constitutional violation, nor in clearly establishing what conduct violates a constitutional right. Thus, because we have jurisdiction over this interlocutory appeal only insofar as it raises purely legal arguments challenging the denial of qualified immunity, we lack jurisdiction over the warden's § 1997e(e) arguments.

In sum, we dismiss for lack of appellate jurisdiction the warden's unreviewable factual challenges to the district court's denial of qualified immunity and the warden's arguments as to § 1997e(e). We proceed to review the warden's purely legal arguments challenging the denial of qualified immunity under the version of the facts most favorable to Fugate. *See Thompson*, 831 F.3d at 371.

**III.**

We review a district court's denial of summary judgment based on qualified immunity de novo, viewing the facts in the light most favorable to the non-movant. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citation omitted). Under the test for qualified immunity, a public official is immune from liability unless the plaintiff establishes: (1) a constitutional violation; and (2) that "the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d

951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Both prongs must be met "for the case to go to a factfinder to decide if [the] officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights.  If either one is not satisfied, qualified immunity will shield the officer from civil damages." *Id.* (citing *Pearson*, 555 U.S. at 236).

Fugate raises three constitutional claims against Warden Erdos: two under the Fourth Amendment and one under the Eighth Amendment.  The district court denied qualified immunity at summary judgment on each of these claims.

### A.  Fourth Amendment claims

The Fourth Amendment to the U.S. Constitution, as applied to the States through the Fourteenth Amendment, prohibits "unreasonable searches and seizures."  *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting U.S. Const. amend. IV).  The Fourth Amendment prohibition on unreasonable searches and seizures, however, does not apply in the same way to inmates as it does to the population outside prison walls.  *Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979) ("convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison" but "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual").

A body of Supreme Court and Sixth Circuit caselaw sets the legal stage here.  Recognizing the need for officials to maintain "safety and order at" prisons, the Supreme Court has devised a balancing test for evaluating the constitutionality of searches of inmates.  *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012).  A corrections official does not violate an inmate's Fourth Amendment rights so long as the search is "reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Applying

this framework requires a court to give prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. With this deference in mind, courts must balance "the need for the particular search against the invasion of personal rights that the search entails." *Stoudemire v. Michigan Dep't of Corrs.*, 705 F.3d 560, 572 (6th Cir. 2013) (quoting *Bell*, 441 U.S. at 559).

> We have boiled this test down to three steps:
>
> First, we determine the nature of intrusion, examin[ing] the scope, manner, and location of the search. Second, we evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions. And third, we determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion.

*Sumpter v. Wayne Cnty.*, 868 F.3d 473, 482 (6th Cir. 2017) (internal citations and quotations omitted).

This "deferential balancing test[,]" we have explained, "originates from *Bell v. Wolfish*, 441 U.S. 520 (1979), where the Court confronted for the first time the issue of strip searches in the corrections context." *Id.* at 480. In *Bell*, the "Court held that a federal detention center's blanket policy of conducting visual body cavity inspections of all detainees returning from a 'contact visit' did not violate the Fourth Amendment." *Id.* at 480–81 (citing *Bell*, 441 U.S. at 558, 560). In so holding, the Court emphasized that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Bell*, 441 U.S. at 547. And prison administrators will "have a better grasp" than a reviewing judge on how to maintain "order and discipline" and "institutional security" in a correctional facility. *Id.* at 547–48. Thus, important for our case, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to" the "expert

judgment" of prison administrators in matters of order and security. *Id.* at 548 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

The Supreme Court applied *Bell* more recently in *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012). In that case, "the Court confronted whether the Fourth Amendment required jail officials to have reasonable suspicion before strip searching new detainees who were arrested for minor offenses and being committed to the jail's general population." *Sumpter*, 868 F.3d at 481 (citing *Florence*, 566 U.S. at 326). Relying on *Bell*, the Court emphasized that, "[i]n addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence*, 566 U.S. at 322–23. Applying that principle, the Court held that the petitioner's claim failed because he did not produce sufficient evidence to show that the jail's strip-search policy was unnecessary or an unjustified response to jail security. *Id.* at 330 ("the record provides full justifications for the procedures used").

This court, too, has applied *Bell*. In *Stoudemire v. Michigan Department of Corrections*, 705 F.3d 560 (6th Cir. 2013), a defendant corrections officer appealed the denial of qualified immunity at summary judgment. The plaintiff—housed in a women's prison—underwent multiple amputations because of a health disorder. *Id.* at 563. Under the plaintiff's version of the facts, one day, while in the infirmary waiting to be transported to an aerobics class, a female officer approached the plaintiff and told her that she intended to conduct a strip search. When the plaintiff asked why, the officer said, "because I can." *Id.* at 566–67. The officer then took the plaintiff into her cell and conducted the strip search, removing her prosthetic legs and stripping her down to her underpants in full view of passersby in the hallway, as the officer did not cover the cell window

during the search. *Id.* at 567. The plaintiff testified that the officer "displayed pleasure" at her discomfort during the search and did not find any contraband. *Id.*

Evaluating the constitutionality of the strip search, this court balanced the nature of the search with the degree of need for the search under the plaintiff's version of the facts. *Id.* at 572–75 (quoting *Bell*, 441 U.S. at 559). Starting with the nature of the search, the scope of the search was highly invasive: the plaintiff was stripped down and had her prosthetic legs removed. The location of the search—in view "where other people can see the person being stripped"—made the search even "more invasive." *Id.* at 573. The manner of the search also heightened the degree of invasiveness: the officer refused to tell the plaintiff the reason for the search and smirked during the search, "suggest[ing] personal animus and implicat[ing] the dignitary interest 'inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches.'" *Id.* (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 499 (6th Cir. 2008)).

Turning to the need for the search, the court noted that "detect[ing] and deterr[ing] the possession of contraband" is "[u]nquestionably . . . a legitimate penological objective." *Id.* (quoting *Florence*, 566 U.S. at 328). And "[a]bsent proof to the contrary, we must assume that a search of a prisoner is initiated in an effort to detect and deter contraband." *Id.* (citation omitted). But the precise question the court focused on was not whether the search was a legitimate way to detect contraband; it was whether any exigencies "compelled [the officer] to strip search [the plaintiff] in view of other inmates and prison personnel." *Id.* at 573–74. On that question, the court held that, "although [the officer] had a valid reason for searching [the plaintiff], no special circumstances provided additional justifications" for the particular type of search—"strip searching [her] where others could see her naked." *Id.* at 574. Thus, "the excessively invasive nature of the search" violated the plaintiff's Fourth Amendment rights. *Id.* at 574.

After holding that the officer violated the Fourth Amendment, the court affirmed the denial of qualified immunity. *Id.* at 575. The court reasoned that the plaintiff "identified a well established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others *unless the procedure is reasonably related to a legitimate penological interest*." *Id.* (emphasis in original) (quoting *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir 2002)). And under these facts, the court concluded, a "reasonable officer would have been on notice that the search was unreasonable under the circumstances and devoid of any legitimate penological justification." *Id.*

Not long after *Stoudemire* came *Williams v. City of Cleveland*, 771 F.3d 945 (6th Cir. 2014). In *Williams*, a putative class sued the city of Cleveland challenging its policy that all detainees entering the city jail be stripped naked, searched, and then sprayed with delousing solution to prevent lice, without any particularized suspicion that the detainees had contraband or lice. *Id.* at 947. After the suit was filed, the Supreme Court decided *Florence*, which—as discussed above—upheld a jail's blanket policy of searching new arrivals without reasonable suspicion. *Id.* In light of *Florence*, the district court granted the city's motion for judgment on the pleadings and denied the plaintiffs leave to amend. *Id.* at 948–49. Thus, the question on appeal was whether the plaintiffs stated a plausible Fourth Amendment claim (and whether the court should have granted them leave to amend), despite the holding in *Florence*. *See id.* We held that the plaintiffs' proposed amended complaint stated a plausible claim and reversed. *Id.* at 953, 956.

In reversing, we focused not on the "blanket policy of strip searching incoming inmates[,]" but on the specific manner in which the jail conducted the strip searches and delousing. Taking the plaintiffs' allegations, "they were ordered to crouch naked on the floor with several strangers in the room while corrections officers . . . hosed off their intimate body parts." *Id.* at 953. Although

the officers did not touch the detainees with their hands, they sprayed the delousing solution directly aimed at their genitals, thus "intentionally caus[ing] physical contact to plaintiffs' naked genitals." *Id.* at 948, 953. These searches were unlike those the Supreme Court considered in *Florence*, where detainees were able to self-apply delousing solution while submitting to a visual inspection for contraband. *Id.* at 954. That distinction was important; if visual searches are "undoubtedly humiliating and deeply offensive to many," *Florence*, 566 U.S. at 341 (Alito, J., concurring), then contact searches are "much more invasive"—causing "deeper injury to personal dignity and individual privacy." *Williams*, 771 F.3d at 952 (collecting cases). Thus, "[g]iven the significant incursion into plaintiffs' privacy rights caused by the jail's preferred method of searching and delousing them, the jail's need to perform the searches in this particular manner must be unusually dire before it can outbalance the affront to plaintiffs' privacy." *Id.* at 954 (citing *Florence*, 566 U.S. at 327). At the pleading stage, the city could not show any penological need reasonably related to the intensely invasive nature of the delousing. *Id.* at 955.

One more case from this circuit informs our analysis. *Sumpter v. Wayne Cnty.*, 868 F.3d 473 (6th Cir. 2017). In *Sumpter*, the female plaintiff sued a female officer and the county jail in Detroit challenging the constitutionality of four strip searches performed on the plaintiff in a small group with other female inmates. *Id.* at 479. The group searches were visual: the officer would instruct the inmates to strip naked and perform a series of movements designed to reveal any contraband hidden in private areas of the body. *Id.* The plaintiff also testified that the officer "made several rude comments about her body odor and hygiene, saying she '[s]mells like a funky monkey'" and needed to shower more. *Id.* at 483. One-on-one searches were the norm, and group searches the exception, the jail said, but the purpose of the group searches was to check for contraband and quickly process arrivals when a "high volume of inmates demanded it[.]" *Id.* at

- 13 -

484. The jail supported its justification with unchallenged evidence about the need to process volumes of inmates and check for contraband efficiently to get them off to "medical care, psychiatric care, or special housing as quickly as possible[.]" *Id.*

Starting with step one of the *Bell* test, the court held that the "scope, manner, and location of the searches" taken together overwhelmingly supported that the "searches plaintiff endured were especially intrusive." *Id.* at 483. The court recognized that strip searches were "especially humiliating" because "[t]he wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed." *Id.* (quoting *Williams*, 771 F.3d at 953). And, just as in *Stoudemire*, the comments made to the plaintiff during the search, "while not dispositive of reasonableness," implicated her Fourth Amendment dignitary interests. *Id.* (quoting *Stoudemire*, 705 F.3d at 573).

Turning to step two—the penological justification for the search—the court cited to the ample evidence supporting the jail's asserted health and safety justifications for the group searches at issue. *Id.* at 484. The court concluded that the plaintiff "presented no evidence to dispute their asserted penological justification, much less 'substantial evidence' that [the jail] 'exaggerated their response to these considerations.'" *Id.* (quoting *Bell*, 441 U.S. at 548). But the court stopped before the final step: balancing the nature of the search with the penological justification to determine whether they were reasonably related. *Id.*

Regardless of the outcome of the balancing, the court said, the officer was entitled to qualified immunity. *Id.* at 485–86. Recognizing the Supreme Court's direction that "specificity [is] important in the Fourth Amendment context," especially under an "ad-hoc interest-balancing test," the plaintiff could not point to a case that "'squarely govern[ed]' the outcome." *Id.* (citing

- 14 -

*Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)). For starters, the plaintiff relied on *Stoudemire* and *Williams* as clearly establishing the right, but those cases were decided after the events giving rise to the plaintiff's claims, so they could not have placed the officer on notice that her conduct was unlawful. *Id.* at 486 (citing *Brosseau*, 543 U.S. at 200 n.4). More importantly, the court distinguished the "critical difference" between *Stoudemire* and *Williams* on one side and the case before the court on the other side: in both *Stoudemire* and *Williams*, "there was *no* penological justification for the particular searches at issue." *Id.* (emphasis in original). The particularized issue before the court in *Sumpter*, however, was whether the plaintiff had a right to be free from "a group strip search *supported* by a legitimate penological justification." *Id.* (emphasis in original).

This distinction is crucial for the qualified immunity analysis. "In the absence of a governmental interest"—in this context, a jail or prison's legitimate penological interest—"the outcome of the balancing test was obvious, so obvious that any reasonable officer in the defendant's position would have known that the search was unreasonable." *Id.* at 487 (citing *Stoudemire*, 705 F.3d at 574–75); *see also Brosseau*, 543 U.S. at 199 ("[I]n an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant caselaw."). But the existence of a legitimate penological interest changes "the balancing calculus[,]" making the outcome not obvious. *Sumpter*, 868 F.3d at 487. As the court summed up the point:

> It is easy enough to predict how scales with one hundred apples on one end will balance out, but it is far more difficult to predict how many oranges must be added to the other side to bring it to equipoise. Tasked with making that second prediction, [the officer] would have found no clues in 'apples-only' cases like *Stoudemire* and *Williams*.

*Id.* at 487–88.

With the legal stage set, we turn to Fugate's claims against Warden Erdos.

## 1. Constitutional violations

Fugate claims that the warden violated his clearly established Fourth Amendment rights in two ways. He first claims that his initial strip search by "seven COs and a white shirt" violated the Fourth Amendment because it was conducted in the presence of more officers than necessary to serve a penological purpose. He next argues that the warden violated his rights because the strip searches were performed without any penological purpose. We start with Fugate's second claim—that there was no penological purpose for ordering Fugate to undergo three daily strip searches for 30 days. Ultimately, there are genuine issues of fact on whether the warden had any legitimate penological justification for ordering Fugate to undergo the strip searches. Accepting Fugate's version of the facts, as we must in this appeal, the warden lacked a penological justification for subjecting Fugate to three strip searches per day for 30 consecutive days. And in the absence of any penological justification, Fugate's right to be free from deeply invasive daily searches was clearly established.

### a. Constitutionality of three strip searches per day in the J1 slammer cell

The warden ordered Fugate to be strip searched during third shift while Fugate was isolated in the J1 slammer cell, in addition to the general order requiring all J1 inmates to be strip searched during the first and second shift. Thus, in effect, the warden ordered Fugate to be strip searched three times a day for 30 days. We evaluate the constitutionality of these searches under the test set out in *Bell* taking Fugate's version of the facts. *See Sumpter*, 868 F.3d at 482.

*1) Nature of the intrusion.* Step one here is straightforward. We have repeatedly recognized that "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Stoudemire*, 705 F.3d at 572

(quoting *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996)); *see also Williams*, 771 F.3d at 952; *Sumpter*, 868 F.3d at 483. This appeal turns on whether the warden had a legitimate penological justification for ordering the strip searches.

*2) Penological justification*. At step two, we evaluate the warden's asserted justification for the searches. *Sumpter*, 868 F.3d at 483–84. If Fugate "gives us no reason to doubt the legitimacy of [Erdos's] asserted justification[,]" *id.*, we "defer to the judgment of [the] correctional officials[.]" *Florence*, 566 U.S. at 322–23.

The warden claims that, because Fugate was "particularly dangerous," the strip searches were necessary to detect any concealed weapons that could be used to attack other inmates or staff. R. 61-4 at ¶ 10. Indeed, Fugate was ordered to the J1 slammer cell because he attacked an officer during an administrative hearing, slashing him in the face with sharpened battery. *Id.* at ¶ 3. Even though the J1 slammer cells were the most secure and secluded cells at Lucasville—housing only the prison's most violent inmates—the warden claims that a strip search was necessary during each shift because Fugate still could have "obtain[ed] a weapon from a porter[,]" particularly after the guards conducted their searches on second shift. *Id.* at ¶ 10.

There can be no doubt that "[d]etecting contraband concealed by" inmates "is a most serious responsibility"—especially in a maximum-security prison, and for a violent inmate like Fugate who had just attacked an officer with a homemade weapon. *Florence*, 566 U.S. at 332. The warden thus met his initial burden at summary judgment: he put forth evidence (his testimony in a declaration) explaining that he was concerned about Fugate obtaining a weapon from a porter. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Below, in his reply to Fugate's response in opposition to summary judgment, the warden also declared: "During my time at [Lucasville], during a search, contraband has been found on an inmate who was located on J-1 in

a slammer cell." R. 73-1 at ¶ 2. Beyond this perfunctory assertion, though, the warden offers nothing in the way of specifics. We do not know from the record whether inmate porters have access to the J1 slammer cells or whether Fugate had access to materials in his slammer cell that he could have made into a weapon.

The burden shifts to Fugate to put forth more than conclusory assertions challenging the warden's asserted justification. *See Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *see also Florence*, 566 U.S. at 323 ("unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security" we defer to the correctional official's discretion). Fugate satisfied that burden. While the asserted penological justification—detecting weapons smuggled to Fugate by an inmate porter—is legitimate on its face, Fugate came forward with testimony giving us "reason to doubt the legitimacy of [the warden's] asserted justification[.]" *Sumpter*, 868 F.3d at 484. Fugate testified— in more detail than the warden's conflicting testimony—that it would have been impossible for a porter to access him in the J1 slammer cell. *See* R. 78-1 at PID 1193. As the warden highlights, the J1 unit holds those "who have committed the most violent offense[s]," and the slammer cells are reserved for those in J1 deemed even more dangerous than the others in the J1 block. R. 61-4 at ¶ 6. Consistent with this fact, Fugate testified that the J1 slammer cells are different even from "average segregation cell[s]." R. 78-1 at PID 1193. The slammer cell requires getting through two sets of doors, and extra bars surround the unit. So even if a porter "accessed the J1 corridor, they would still have to open another locked gate to get anywhere close to a slammer-cell inmate." Appellee's Br. at 9; R. 78-1 at PID 1193 ("[T]hat way just in case a porter does come in, he still has no opportunity to get back there to you. So they have to open another gate to even come back there in the area. Absolutely no way for me to get nothing, period."). Thus, under Fugate's version

of the facts, obtaining contraband from an inmate porter while housed in the J1 slammer cell would not have been reasonably possible.

Fugate's testimony goes beyond mere "conclusory [claims] that there was no legitimate penological need" for the frequent strip searches. *Sumpter*, 868 F.3d at 484. The warden did not present evidence that an inmate porter would not only have access to Lucasville's most secure unit, but also the more secure, isolated slammer cells within that unit. *Cf. Florence*, 566 U.S. at 330 ("the record provides full justifications for the procedures used"); *Sumpter*, 868 F.3d at 484 ("Plaintiff gives us no reason to doubt the legitimacy of defendants' asserted justification"). Thus, under Fugate's version of the facts, the warden lacked a legitimate penological need for imposing three daily strip searches for an inmate housed in a J1 slammer cell.

Taking Fugate's version of the facts, this case looks a lot like *Parkell v. Danberg*, 833 F.3d 313 (3d Cir. 2016). There, the Third Circuit affirmed the denial of summary judgment on an inmate's claim that prison officials violated the Fourth Amendment by subjecting him to three daily strip searches while housed in the prison's segregated housing unit for a disciplinary violation. *Id.* at 325. The court noted that its "review is deferential" to the officials given the prison's "countervailing security interests[.]" *Id.* at 327. Nonetheless, the prison officials were not entitled to summary judgment because they "[were] unable to articulate a single plausible theory as to how inmates in isolation in C–Building would have thrice-daily opportunities to smuggle in contraband from outside their cells or use unsupervised time in their locked cells to transform a harmless object into something dangerous." *Id.*

It's true that when an inmate is in segregated housing, officials have a "maginf[ied] . . . security interest, insofar as inmates who have already broken prison rules may be more likely to seek and utilize dangerous contraband[.]" *Id.* at 328. But "[t]hrice-daily body cavity searches

- 19 -

have little, if any, value" "[w]hen dangerous inmates are completely isolated." *Id.* It is the complete "isolation"—not the frequent strip searches—that "prevents the smuggling of contraband." *Id.* Unlike cases such as *Bell*, where the Court upheld a policy of strip-searching new arrivals who would be much more likely to have contraband concealed on them, "the probability is vanishingly small that an inmate locked in a stripped-down isolation cell . . . once searched, could then obtain contraband during a subsequent eight-hour period involving no human contact." *Id.*

What was true in *Parkell* is true here. While we must "afford[ ] deference to the judgements of correctional officers . . . we must not confuse deference with abdication[.]" *Stoudemire*, 705 F.3d at 571–72. Though the warden states that Lucasville had a "rash of serious assaults where inmates" had obtained contraband and made homemade weapons—just as Fugate had done prior to his transfer to the J1 slammer cell—the warden does not claim that any of those assaults came from inmates who were housed in the more secure J1 block at the time of those assaults. And the warden did not submit any evidence to show that porters can even come close to accessing the slammer cells, nor any other specific evidence to show how Fugate could have obtained contraband while in the slammer cell. Fugate was not searched after returning to J1 from another area of the jail, or from outside the jail, where he could have conceivably obtained contraband. Rather, by the warden's own account, Fugate was taken from his isolated cell every eight hours—itself located in Lucasville's most secure unit—moved to a shower, strip searched, and then returned to his isolated cell. The warden has not presented evidence to show how Fugate, "once searched, could then obtain contraband during a subsequent eight-hour period involving no human contact." *Parkell*, 833 F.3d at 328. Further undermining the warden's purported justification is that he offers no explanation for why all the daily strip searches suddenly ceased, including the two required by

the post order, despite Fugate remaining in the J1 slammer cell for at least another month. At bottom, we cannot defer to the warden's discretionary judgment at this interlocutory stage because there are factual disputes on whether he "exaggerated [his] response to [the] considerations" of "institutional security." *Bell*, 441 U.S. at 548.

To be sure, we do not hold that prisons can *never* strip search inmates housed in more secure cells, or even that the warden here could not have ordered *some* strip searches of Fugate while he was housed in the J1 slammer cell. As this case shows, inmates kept in more secure cells are typically those like Fugate who pose a greater danger to guards and other inmates. *See Parkell*, 833 F.3d at 328. But regardless of how dangerous an inmate is, repeated invasive strip searches must be supported by a legitimate penological justification beyond the fact that the inmate is dangerous. We express no opinion on how many searches under these facts might have been legitimate; we are not in the business of micromanaging the "day-to-day operation of [ ] corrections facilit[ies]." *Bell*, 441 U.S. at 547. We hold only that Fugate has sufficiently undermined, for purposes of summary judgment, the warden's asserted justification for ordering Fugate to undergo 90 strip searches over the course of 30 days when, under Fugate's version of the facts, he had no conceivable way to obtain contraband while housed in the J1 slammer cell. *See., e.g.*, *Parkell*, 833 F.3d at 327.

*3) Weighing the nature of the intrusion against the need*. Without a legitimate penological justification, we are left with an "apples-only" case—invasive searches not supported by any countervailing governmental interest. *Sumpter*, 868 F.3d at 487–88. If the warden had put forth evidence showing that Fugate could have obtained contraband from a porter after the guards on each shift completed their search—or some other valid reason supported by evidence—the "wide-ranging deference," *Bell*, 441 U.S. at 547, we must give to prison administrators' discretionary

judgments would kick in. *See Florence*, 566 U.S. at 330; *Sumpter*, 868 F.3d at 482. But the warden did not put forth such evidence below.

In sum, under Fugate's version of the facts, the warden violated Fugate's Fourth Amendment rights because the strip searches were "devoid of any legitimate penological justification related to security and order." *Stoudemire*, 705 F.3d at 575; *see also Parkell*, 833 F.3d at 330 n.10 (collecting cases from other circuits "allow[ing] inmates to pursue Fourth Amendment claims after being subjected to bodily searches when they had had no opportunity to obtain contraband").

### b. Constitutionality of the first strip search

Warden Erdos also appeals the district court's denial of qualified immunity on Fugate's challenge to the way his first strip search was allegedly conducted. Fugate claims that seven corrections officers and a supervising officer witnessed the search and made demeaning comments during the search, and therefore the manner in which the search was conducted lacked a penological purpose. *See Stoudemire*, 705 F.3d at 574.

The warden's appeal as to Fugate's claim about the way his first strip search was conducted is based on factual arguments over which we lack jurisdiction. The warden argues that "[t]here is no evidence that the strip-searches were conducted in a manner meant to embarrass or demean" him, Appellant's Br. at 22, but Fugate testified otherwise. Fugate testified that the same officers "who just beat [his] ass" told him to strip, bend over, and to spread his "cheeks all the way." He also claimed that the officers would laugh and joke about Fugate "spread[ing] [his] cheeks[.]" R. 78-1 at PID 1209. As we have repeatedly stated, demeaning comments during an already invasive search offend the "dignitary interest 'inherent in in the privacy component of the Fourth Amendment[.]'" *Sumpter*, 868 F.3d at 483 (quoting *Stoudemire*, 705 F.3d at 573). Thus, contrary

to the warden's argument, Fugate did present evidence—which we must take as true—that the search was conducted in an undignified manner.

The warden also impermissibly challenges the inferences drawn by the district court. *See Gillispie*, 18 F.4th at 916 ("[A] defendant may not challenge the inferences that the district court draws from [the] facts, as that too is a prohibited fact-based appeal." (citation omitted)). He argues that "there is no evidence demonstrating that Erdos actively participated in the searches, or ordered that those searches be conducted in an unprofessional manner." Appellant's Br. at 24. The warden is right that he cannot be held liable under a theory of respondeat superior, but the district court addressed this precise point, stating: "the Court is not convinced there is 'no evidence' linking Erdos to the 'manner' of the searches, as Defendants claim. There may be no direct evidence. But a reasonable juror could infer Erdos's involvement in the manner of the searches inferentially from . . . [Fugate's] testimony regarding Erdos's animus toward [Fugate]." R. 89 at 7. We lack jurisdiction to consider a challenge to this inference on interlocutory appeal. *Gillispie*, 18 F.4th at 916.

### 2. Clearly established law

Having determined that there are genuine issues of fact on the constitutional question, we proceed to the second prong of the qualified immunity analysis: whether the right Fugate asserts was clearly established. *Sumpter*, 868 F.3d at 485. Fugate points to a clearly established right to be free from strip searches performed without any penological interest, relying on *Sumpter* and *Stoudemire*.

Even when a defendant violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity unless the right at issue was "clearly established[.]" *Pearson*, 555 U.S. at 232. "A right is clearly established when it is 'sufficiently clear that every reasonable official

would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). A case "directly on point" is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). The inquiry depends on the specific facts of the case and their similarity to caselaw in existence at the time of the alleged violation. *Id.* The Supreme Court has emphasized, in the Fourth Amendment excessive force context, that specificity is "especially important" because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix*, 577 U.S. at 12). Still, general standards are sufficient to "clearly establish" a right "in an obvious case[.]" *Id.* at 8 (quoting *Brosseau*, 543 U.S. at 199).

In *Sumpter*, we recognized that *Stoudemire*, decided in 2013, established that "in the absence of a governmental interest" for a strip search, "the outcome of the balancing test was obvious, so obvious that any reasonable officer in the defendant's position would have known that the search was unreasonable." *Sumpter*, 868 F.3d at 487 (citing *Stoudemire*, 705 F.3d at 575). In other words, *Stoudemire*—and more generally, the seminal Supreme Court case, *Bell*—clearly established that where a corrections official lacks *any* penological interest for a search, the "general" standard is sufficient to place a reasonable officer on notice because the case is an obvious one. *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau*, 543 U.S. at 199).[2] That conclusion

---

[2] One technical but important distinction: *Sumpter* does not clearly establish the law here because it was decided after the events giving rise to this case. *See Sumpter*, 868 F.3d 473 (decided Aug. 18, 2017). We rely on *Sumpter*'s holding about what *Stoudemire* clearly established, because *Stoudemire* was decided in 2013.

is harmonious with the Supreme Court's admonitions for determining whether a right is clearly established in Fourth Amendment excessive force cases. In excessive force cases, where the constitutional test is "objective reasonableness," an officer will not be able to fairly "determine how the relevant legal doctrine" applies to his case without a sufficiently similar factual scenario that theoretically places the officer on notice that his conduct is unlawful. *See id.* (quoting *Mullenix*, 577 U.S. at 12). The same is true in unlawful search cases: where the constitutional test is one of objective "interest-balancing, the point at which the constitutional shades into the unconstitutional will necessarily be gray." *Sumpter*, 868 F.3d at 488 (citing *Brosseau*, 543 U.S. at 201). But where there is no governmental interest, there's nothing to balance against the interests of the inmate, and the outcome of a one-sided "apples-only" balancing test is obvious. *Id.* at 487–88.

Here, under Fugate's version of the facts, this is an "obvious" case. *Sumpter*, 868 F.3d at 487. As discussed at length above, whether the warden had any penological purpose for ordering three daily strip searches for an inmate in a J1 slammer cell turns on the disputed issue of whether an inmate in such a secure, isolated cell could have obtained contraband from an inmate porter (the warden's asserted justification for the search) or some other way. Under Fugate's version of the facts, without any legitimate penological purpose for the excessive number of invasive strip searches, the general standards in *Stoudemire* and *Bell* suffice to clearly establish the constitutional violation. *Sumpter*, 868 F.3d at 487.

The warden resists this conclusion, countering that the searches were supported by a legitimate penological justification, and thus no case sufficed to place him on notice that ordering the strip searches was unlawful. This description of the right at issue rests on a disputed issue of fact: whether imposing 90 strip searches over the course of 30 days was supported by a legitimate

penological justification. And "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010)).

In sum, we affirm the denial of qualified immunity to Warden Erdos on Fugate's Fourth Amendment claims.

## B. Eighth Amendment claim

Fugate also asserts a claim under the Eighth Amendment against Warden Erdos. Fugate asserts that the warden violated a clearly established right to be free from strip searches maliciously imposed as punishment. The district court denied the warden qualified immunity. We evaluate the warden's claim to qualified immunity under the two-pronged test.

### 1. Constitutional violation

The Eighth Amendment to the U.S. Constitution, as applied to the States through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Cruel and Unusual Punishments Clause protects inmates against "maliciously motivated searches" and "intentional harassment of even the most hardened criminals . . . ." *Hudson v. Palmer*, 468 U.S. 517, 528 (1984).

In the strip-search context, we have recognized that the principal inquiry under the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Cornwell v. Dahlberg*, 963 F.2d 912, 918 (6th Cir. 1992) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). While we did not parse the distinction in *Cornwell*, the en banc Seventh Circuit recently articulated the distinction between the Eighth Amendment and the Fourth Amendment as they relate to prison strip searches: The Fourth

Amendment, as discussed earlier, "protects prisoners from searches that may be related to or serve some institutional objective, but where guards nevertheless perform the searches in an unreasonable manner, in an unreasonable place, or for an unreasonable purpose." *Henry v. Hulett*, 969 F.3d 769, 781 (7th Cir. 2020) (en banc). The Eighth Amendment, on the other hand, "safeguards prisoners against the use of searches that correctional officers subjectively intend as a form of punishment." *Id.*

With these standards in mind, Fugate has come forward with evidence that the warden maliciously ordered the third daily strip search as punishment. Fugate testified that:

- The warden came to his cell the first night after Fugate assaulted the hearing officer and told him, "if you do anything else to my staff, we're going to beat the fuck out of you again.";

- His first strip search, which came after the warden's order that Fugate was to be "shookdown" after every shift, was performed by eight officials and done in a demeaning manner;

- The warden told a guard, who did not want to continue performing the strip searches, that the searches would end "when I feel like it."

R. 78-1 at PID 1191, 1198.

As the district court recognized, this testimony—combined with the evidence tending to show that the excessive number of searches served no legitimate interest—is sufficient for a reasonable inference that the warden ordered the additional daily strip search "maliciously and sadistically to cause harm." *Cornwell*, 963 F.2d at 918. Tellingly, the warden never disputes in his two declarations that he threatened Fugate or that he told a guard that the searches would end "when [he felt] like it." R. 78-1 at PID 1198. His appeal rests on perfunctory assertions in the briefing, such as: "Fugate fails to offer any evidence to support his contentions that Erdos acted with [the] requisite intent." Appellant's Br. at 34. As discussed earlier, we lack jurisdiction over these factual challenges to the district court's denial of qualified immunity. *See Gillispie*, 18 F.4th

at 916; *see also Johnson*, 515 U.S. at 313 (holding that the denial of qualified immunity at summary judgment is not appealable when the appeal "determines only a question of 'evidence sufficiency[.]'").

### 2. Clearly established law

The warden claims that no clearly established law placed him on notice that ordering the strip searches violated the Eighth Amendment. We disagree.

We held in 1992 that, in the context of a prison strip search, force applied "maliciously and sadistically" and not in a "good-faith effort to maintain or restore discipline" violates the Eighth Amendment's Cruel and Unusual Punishments Clause. *Cornwell*, 963 F.2d at 917. In that case, a male inmate was ordered to undergo a group strip search outside in the cold and in the presence of female officers after participating in a prison riot. *Id.* at 914–15. We affirmed a verdict in favor of the defendant officer on the inmate's Eighth Amendment claim and, in doing so, established that the district court correctly instructed the jury on the maliciousness standard that applied to the inmate's Eighth Amendment claim challenging the strip search. *Id.* at 917–18.

Although *Cornwell* is not "directly on point," *Rivas-Villegas*, 142 S. Ct. at 7 (quoting *White*, 137 S. Ct. at 551), the "operative inquiry" is "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1097 (6th Cir. 2019) (citation omitted). Under Fugate's version of the facts, *Cornwell* would have made it clear to any reasonable officer in the warden's position that maliciously imposing 90 strip searches in a period of 30 days to punish Fugate violates the Eighth Amendment.

True, the Supreme Court has been clear regarding Fourth Amendment violations that specificity of prior cases is "especially important" because it can be difficult for an officer to know

whether his conduct is objectively reasonable in a given scenario. *Mullenix*, 577 U.S. at 12. But the Court has not required the same level of specificity for Eighth Amendment violations. That lines up with the purpose of qualified immunity: fair notice. *See id.* It is difficult for an official to conform his actions to the constitution with notice of only a general *objective* reasonableness standard. It is much easier, however, for a reasonable official to conform his conduct to the Constitution with notice that he cannot impose punishment with a "malicious[ ] or sadistic[ ]" *subjective* state of mind, even without a prior case with facts that specifically match the official's case. *Cornwell*, 963 F.2d at 917; *see also Palmer*, 468 U.S. at 528 (the Eighth Amendment prohibits "*intentional* harassment of even the most hardened criminals." (emphasis added)). In all, *Cornwell* is sufficient to make "clear to a reasonable officer[,]" *Rafferty*, 915 F.3d at 1097, that it violates the Eighth Amendment to impose a draconian number of strip searches "maliciously and sadistically" for the purpose of punishment rather than in a "good-faith effort to maintain or restore discipline[.]" *Cornwell*, 963 F.2d at 917. Thus, we affirm the denial of qualified immunity to the warden on Fugate's Eighth Amendment claim.

**IV.**

We **DISMISS IN PART** for lack of appellate jurisdiction and **AFFIRM** the district court's denial of qualified immunity at summary judgment.